IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 24, 2024 Session

## STATE OF TENNESSEE v. DARRIUS LEVON ROBINSON

**Appeal from the Criminal Court for Hamilton County**
**No. 311966   Boyd M. Patterson, Judge**

_____

### No. E2023-00391-CCA-R3-CD

_____

The Defendant, Darrius Levon Robinson, appeals from his guilty-pleaded conviction for attempted second degree murder, a Class B felony. *See* T.C.A. §§ 39-13-210 (2018) (second degree murder); 39-12-101 (2018) (criminal attempt). The trial court ordered the Defendant to serve the agreed upon eight-year, Range I sentence in confinement. On appeal, the Defendant contends the court erred by denying alternative sentencing and abused its discretion by failing to consider appropriate sentencing factors. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

Melody F. Shekari (on appeal) and Brandy L. Spurgin-Floyd (at plea and on appeal), Chattanooga, Tennessee, for the appellant, Darrius Levon Robinson.

Jonathan Skrmetti, Attorney General and Reporter; Caroline W. Weldon and Courtney N. Orr, Assistant Attorneys General; Coty G. Wamp, District Attorney General; and AnCharlene Davis, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to the December 25, 2020 shooting of Darrell Oldham, the Defendant's then-girlfriend's father. During a Christmas family gathering at Mr. Oldham's home, the Defendant and Mr. Oldham argued. When the argument escalated, the two men went outside to the front yard. At some point during the argument, the Defendant retrieved a semi-automatic handgun from his car and shot Mr. Oldham five times, including after Mr. Oldham had rolled beneath a truck for protection.

The Defendant was indicted for attempted first degree murder, aggravated assault, and reckless endangerment. In exchange for the Defendant's agreement to plead guilty, the State agreed to the lesser charge of attempted second degree murder and an eight-year sentence, with the manner of service to be determined by the trial court. All other charges were dismissed.

The record contains the transcript of the February 17, 2023, sentencing hearing, but it does not contain a transcript of the guilty plea hearing.

At the sentencing hearing, Mr. Oldham testified that on Christmas Day 2020, he invited the Defendant, Mr. Oldham's daughter Jada Oldham, and Mr. Oldham's two young grandsons to his home. Mr. Oldham said that he drove the two-year-old grandson to his home and that the others arrived soon thereafter. Mr. Oldham said that when they arrived, his wife, daughter Aaliyah Oldham, and Aaliyah's boyfriend were already there. He acknowledged that he and the Defendant had been drinking alcohol.

Mr. Oldham testified that he brought gifts for the children, including a stuffed dinosaur that scared one of the grandsons, who started "crying and crying." Mr. Oldham said that he and the Defendant disagreed regarding how to manage the child's reaction to the toy, and an argument ensued. Mr. Oldham said that he asked the Defendant to step outside because the Defendant "cursed [the child]." Once in the front yard, Mr. Oldham said that the argument got "heated," that he and the Defendant "got close to each other," that Aaliyah's boyfriend separated them, and that Mr. Oldham's wife came out to try to encourage everyone to leave. Mr. Oldham said that Jada came out, that she hit the Defendant, that the Defendant went to his car, and that the Defendant pointed a handgun at Mr. Oldham.

Mr. Oldham testified that he heard the first gunshot and dropped to the ground, rolling side to side. He said that he heard more gunshots, that he knew he had been shot, and that he felt paralyzed and was unable to stand. He stated that he crawled from the front of the house toward his truck, located toward the back of the house, in order to prevent shots from being fired toward family members who were inside the front door. Mr. Oldham stated that the Defendant was running after him. Mr. Oldham said he positioned himself partially under a truck, but the Defendant shot him again. Mr. Oldham said that he waited for the Defendant to kill him. Because Mr. Oldham did not hear any more gunshots, he said that he crawled to the back porch where Aaliyah found him. Mr. Oldham said that he told her to call 9-1-1 because he was bleeding and "couldn't breathe." He said that Aaliyah told him to "keep breathing."

Mr. Oldham testified that he was shot once each in the arm, hip, and back, and twice in the colon. He said he had surgery followed by rehabilitation requiring a wheelchair and

a walker. He stated that he had permanent numbness down the side of his left leg where one of the bullets "knocked a nerve off [his] spine" and that he had residual pain as a result of his shattered hip. Mr. Oldham said that the shooting had a great impact on his life and that it was a "rough road . . . to get back to where [he] was right now." He believed the Defendant tried to kill him.

Craig Gregory, the Defendant's supervisor at MPW Services, testified that he was a supervisor at a Volkswagen facility where the Defendant had worked full-time for about a month. He described the Defendant as "stressed, impatient, but eager to make a change." Mr. Gregory said the Defendant showed up and performed well at work.

Jerome Scott testified that he and the Defendant planned to produce rap music until the Defendant's "spiritual journey" led him to abandon music with explicit content. Mr. Scott described the Defendant as being "family-oriented."

Jessica Carter, director of the Tennessee Department of Correction Day Reporting Center (DRC), testified that the DRC was an alcohol and drug rehabilitation program for individuals on felony probation and parole. She said the DRC also provided mental health, physical health, and employment assistance. She stated that the Defendant was a "good fit" for the DRC and would benefit from the DRC's anger management and GED programs. Ms. Carter's assessment of the Defendant for the DRC program was received as an exhibit.

Jada Oldham, the Defendant's wife, testified that they had two children and that the victim was her father. Ms. Oldham stated that she was at her father's house on Christmas Day 2020, that the victim and the Defendant began arguing, that the victim asked the Defendant to step outside, that she went outside, and that she saw them arguing and pushing each other. She said that she and her sister's boyfriend tried to intervene, but "it [was] a losing battle." She stated that she and the Defendant went toward their car, that she heard a series of gunshots, and that she saw the victim on the ground. She stated that the Defendant stayed in one place until the police arrived. She acknowledged that the victim and the Defendant had been drinking alcohol.

Ms. Oldham testified that she married the Defendant after the shooting and that she did not see her family often. She stated that she worked from home and that the Defendant or his mother were the children's primary caregivers. Ms. Oldham stated that the Defendant had steady employment until he received minor injuries in a car wreck. Ms. Oldham described the Defendant as being family-oriented, spiritual, and apologetic.

On cross-examination, Ms. Oldham testified that she did not know the Defendant had a gun in their car. She acknowledged that the victim fled from the front yard to the back of the house, that she went into the house after the shooting, and that the Defendant remained in the front yard.

Joe Jenkins testified that he started the Building Relationships and Valuable Encounters (BRAVE) program to provide lifestyle-development coaching to men reentering society after incarceration. Mr. Jenkins stated that he had been coaching the Defendant and described him as "accountable," "credible," and "transparent." Mr. Jenkins said he was impressed by the Defendant's attitude and commitment to recommendations and assignments. Mr. Jenkins thought the Defendant could be a BRAVE team member and said that the Defendant's life had a good trajectory but that the Defendant could be impulsive. Mr. Jenkins stated that he had no hesitation or concern working with the Defendant and recommended the Defendant have a chance to contribute to the community instead of being incarcerated. Mr. Jenkins's letter regarding the Defendant's participation in BRAVE was received as an exhibit.

The Defendant provided the following allocution:

Your Honor, I wrote this letter to express my deep remorse for the heinous incident I am guilty of. I had a lot of time to self-reflect. I truly apologize to those I have hurt. I come so far just to set myself so far back. I take all the responsibility for what I've done. Since the incident, I met very wonderful people that help me and want to see me doing better. I do want to change to show everyone, especially my wife and kids, that my mistakes does not define who I am, it's what I do after that does. Again, I truly apologize and wish to have a chance to prove myself.

The presentence report was received as an exhibit and reflected the following: The Defendant was age thirty at the time of the offense, dropped out of school in the ninth grade, and was interested in obtaining his GED. The Defendant's criminal history from 2009 until 2012 included convictions for ten misdemeanors including criminal trespass, evading arrest, failure to appear, and unlawful possession of a weapon. He reported "fair" mental health and "good" physical health. He reported past occasional use of MDMA, hydrocodone, and cocaine when he was younger and said he had consumed alcohol and marijuana on the day of the shooting. He reported that he had not used illicit drugs for two years and that he made a promise to abstain from future drug use. He indicated that he had never participated in any drug treatment programs.

The Defendant reported that he lived with his wife and children and that he had a good relationship with his mother, father, and two half-brothers. He reported that he was married to Jada Oldham, that they had been in a relationship for six years, and that they had two-year-old and four-year-old sons. The Defendant's past employment included part-time work at car washes, at a restaurant, and doing maintenance work. The Strong-R Risk and Needs Assessment Tool, which was attached to the presentence report, reflected that the Defendant had a "low" overall risk score.

After receiving the evidence and hearing testimony from the hearing, the trial court's primary concern was the need not to depreciate the serious nature of the offense. The court noted that the parties agreed to an eight-year sentence and that no presumption of favorability for alternative sentencing applied because the conviction offense was a Class B felony. The court noted that the 9-1-1 call relayed the "chaos" of the scene as the victim's daughter told the victim to keep breathing and that she loved him. The court credited the victim's testimony regarding the events that occurred on the day of the shooting, including his hearing and feeling gunshots while he was rolling on the ground trying to get away from the Defendant. The court also noted the serious nature of the victim's injuries, including permanent numbness from a spine injury and the need for two surgeries. The court noted that the evidence established that the Defendant was trying to live a moral lifestyle, that he had a good relationship with his employer, that he would be a candidate for the DRC, that he was a good father, that he had performed well in the BRAVE mentoring program, and that he had made positive changes in his life since the incident. The court found that the Defendant "when he allocated, he expressed remorse, that he said he'd take responsibility, and he apologized."

The trial court acknowledged that the presentence report reflected that the Defendant was employable and had a low risk of reoffending. The court gave little weight to the fact that less restrictive measures had been frequently applied when the Defendant was younger and found the Defendant had a high potential for rehabilitation. The court found that mitigating factor (11) did not apply because the family gathering was not an "unusual circumstance." *See* T.C.A. § 40-35-113(11) (2019). The court gave little weight to the Defendant's criminal history but did apply an enhancement factor for the possibility of multiple victims because the Defendant fired gunshots in a neighborhood and near a home filled with people. *See* T.C.A. § 40-35-114(3) (2019). The court gave some weight to the seriousness of Mr. Oldham's injuries and found that the Defendant "had no hesitation about committing a crime when the risk to human life was high." T.C.A. § 40-35-114(10); *see* T.C.A. § 40-35-114(6). The court acknowledged the appropriateness of the Defendant's allocution but was not convinced as to its sincerity. The court concluded that incarceration was necessary because of the seriousness of the offense and the presence of several enhancement factors, including the use of a handgun. *See id.* §§ 40-35-103(1)(B) (2019), -114(9).

The Defendant contends that the trial court abused its discretion in imposing incarceration, rather than an alternative sentence, and that the court failed to consider appropriate sentencing factors. Specifically, the Defendant argues that the seriousness of the offense did not merit confinement, that the court incorrectly applied two enhancement factors, and that the court failed to apply appropriate mitigating factors. The State responds that no abuse of discretion has been shown. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, the potential for rehabilitation or treatment, and the result of the validated risk and needs assessment. T.C.A. §§ 40-35-103, -210 (2019); *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2019).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 707. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *State v. Caudle*, 388 S.W.3d 273, 278–79 (Tenn. 2012); *see Bise*, 380 S.W.3d at 708. Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2014). The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259 (Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b) (2019); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *Ashby*, 823 S.W.2d at 168; *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant who otherwise qualifies for probation or alternative sentencing to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C); *see Trotter*, 201 S.W.3d at 654. A trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. *See State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (concluding that the same factors used to determine whether to impose judicial diversion are applicable in determining whether to impose probation); *see also State v. Electroplating, Inc.*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996). Further, when the sole issue before the trial court is the manner of service, "information offered on the enhancement and mitigating factors is relevant to [a] determination of 'the appropriate combination of sentencing alternatives that shall be imposed on the defendant[.]'" *State v. Bolling*, 75 S.W.3d 418, 421 (Tenn. Crim. App. 2001) (citations omitted).

The Defendant contends that the trial court erred by finding that confinement was necessary to avoid depreciating the seriousness of the offense. If probation is denied solely on the basis of the circumstances of the offense, they "must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring a sentence other than probation. *State v. Hartley*, 818 S.W.2d 370, 374-75 (Tenn. Crim. App. 1991) (citations omitted). This court has recognized, "This standard has essentially been codified in the first part of [Tennessee Code Annotated] § 40-35-103(1)(B) which provides for confinement if it 'is necessary to avoid depreciating the seriousness of the offense.'" *Id*. at 375.

As a prefatory matter, we note that the transcript of the guilty plea hearing is not part of the appellate record. *See State v. Keen*, 996 S.W.2d 842, 843-44 (Tenn. Crim. App. 1999) ("[A] transcript of the guilty plea hearing is often (if not always) needed in order to conduct a proper review of the sentence imposed."); *see also* T.R.A.P. 24(b) (stating that the appellant has the duty to prepare a record which conveys a "fair, accurate, and complete account of what transpired with respect to those issues which are the bases of appeal."). An appellant who fails to include the transcript of the guilty plea hearing in the record risks waiver of a sentencing issue. Nevertheless, an appellate court will consider on a case-by-case basis whether a record is sufficient for review. *Caudle*, 388 S.W.3d at 279. In the present case, we will consider the Defendant's sentencing issue on its merits,

notwithstanding the absence of the transcript of the guilty plea, because the facts of the offense are stated in the presentence report and were testified to at the sentencing hearing.

Although the trial court based its sentencing decision on factors in addition to the need not to depreciate the seriousness of the offense, the record reflects that the circumstances of the offense surpass the *Hartley* threshold. The court found that the Defendant shot Mr. Oldham five times, including shooting Mr. Oldham while he was on the ground beneath his truck. The court noted that the incident could have easily ended with a homicide. The court found that the Defendant chased the victim while continuing to shoot at him, that the victim feared for his life, and that the victim believed he was going to die. The court noted that the Defendant shot the victim a total of five times—twice in the colon and once each in the arm, back, and leg. The court found the 9-1-1 call "impactful" as it depicted the victim's daughter telling her father to "keep breathing" and the father and daughter expressing love for each other not knowing if that would be the last time they would ever see each other. The court also gave "some weight" to the victim's injuries which required two surgeries and left the victim with permanent numbness in his hip and leg. The trial court was heavily swayed by the circumstances of the offense and stated on the record that it relied upon the seriousness of this crime in denying alternative sentencing. The facts support the court's conclusion in this regard.

The Defendant contends that the trial court erred by applying enhancement factor (3), which regards an offense involving more than one victim. *See* T.C.A. § 40-35-114(3). The State agrees. Under the facts of this case, we agree that enhancement factor (3) does not apply. However, misapplication of an enhancement factor does not invalidate the Defendant's agreed upon eight-year sentence. *See Bise*, 380 S.W.3d at 706.

The Defendant contends that the trial court should not have applied enhancement factor (10), which relates to an offense committed without hesitation when the risk to human life was high, and that the court should have applied mitigating factor (11), which relates to incidents committed under such "unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct." *See* T.C.A. §§ 40-35-114(10), -113(11). The court found that enhancement factor (10) applied given the number of people present at the time the Defendant fired multiple shots. The court found that mitigating factor (11) did not apply because the family gathering was not the type of "unusual circumstance" contemplated by the factor and because the facts demonstrated the Defendant chased Mr. Oldham with the intention of killing him. The court's decision to apply enhancement factor (10) and not to apply mitigating factor (11) is supported by the evidence.

The Defendant contends that the trial court erred in the limited weight it gave to the presentence report and the Defendant's allocution. The record reflects that the trial court discussed and considered the presentence report's findings including the Defendant's past

employment, criminal history, risk of reoffending, and the Defendant's potential for rehabilitation. Based upon the Defendant's criminal history, the court found that "measures less restrictive than confinement [had] frequently been applied unsuccessfully; maybe, but that really [was] something that deserve[d] little weight." While the record reflects that the Defendant had completed multiple probationary sentences, the court found that previous measures less restrictive than confinement failed to prevent the Defendant from committing additional crimes. *See State v. Hooper*, 29 S.W.3d 1, 13 (Tenn. 2000) (upholding a trial court's denial of alternative sentencing based on deterrence grounds that included the need to prevent the defendant from engaging in the same illegal conduct); *State v. William S. Vanwinkle*, No. M2017-00812-CCA-R3-CD, 2018 WL 2383613, at *6 (Tenn. Crim App. May 25, 2018) (the record fully supports the denial of all forms of alternative sentencing where the facts demonstrate that measures less restrictive than confinement have failed to deter the defendant from continuing criminal activity).

The Defendant contends that the trial court erred by "considering whether sworn testimony would be 'more remorseful' than an allocution." *See State v. Patrick Wayne Evans*, No. M2015-00897-CCA-R3-CD, 2016 WL 3992524, at *10 (Tenn. Crim. App. July 21, 2016), *no perm. app. filed.* The trial court gave less weight to the Defendant's allocution because the court indicated that it "would have gotten a better sense of the depth of [the Defendant's] remorse if the Defendant had been subject to cross-examination." While the Defendant complains of the limited weight given to his allocution, the record reflects that the court found that "the [D]efendant, when he allocuted, he expressed remorse, that he said he'd take responsibility, and he apologized." The court, noting the allocution was brief, found that the statement contained the "right things," that "the words were correct," but that the court was unsure "how sincere they were."

"It is the role of the trial court to assess the credibility and demeanor of the defendant during the allocution and then make a determination as to remorse." *Id.* "[A] trial court's findings of fact and credibility determinations at sentencing are generally binding on this [c]ourt." *State v. Bryan A. Erwin*, No. E2021-01232-CCA-R3-CD, 2022 WL 3355024, at *11 (Tenn. Crim. App. Aug. 15, 2022) (citing *Parker*, 932 S.W.2d at 956). While the court noted that the allocution was unsworn, effecting the Defendant's "depth" of remorse, the record reflects that the court gave less weight to the Defendant's allocution because it was brief, did not address the issues in the case fully, and may have lacked sincerity. We will not disturb the court's conclusion in this regard.

In denying alternative sentencing, the trial court acknowledged that the Defendant was eligible for probation but was not "a favorable candidate for alternative sentencing options" pursuant to Tennessee Code Annotated section 40-35-102 (6)(A). "A defendant . . . who is an especially mitigated or standard offender convicted of a Class C, D or E felony, should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary[.] *Id.* The court stated on the record that it found

that the nature and circumstances of the offense were "as serious as it gets" and that confinement was necessary to avoid depreciating the seriousness of the offense. The court also considered that the Defendant's previous multiple probationary sentences had failed to prevent the Defendant from committing additional crimes. *See State v. Sihapanya,* 516 S.W.3d 473, 476 (Tenn. 2014) (where the trial court combines the need to avoid depreciating the seriousness of the offense with the need for deterrence and the nature and circumstances of the offense, a heightened standard of review is not necessary and the court of appeals should not substitute its judgment for that of the trial court.). The court's denial of alternative sentencing is accorded a presumption of reasonableness, and the record supports the court's conclusion in this regard. *See Caudle*, 388 S.W.3d at 278-79; *Trotter*, 201 S.W.3d at 656.

Upon review, we determine that no abuse of discretion has been shown. The trial court was heavily swayed by the seriousness of the offense and other factors. The record reflects that the court stated the factors it considered and its reasons for denying alternative sentencing.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE